UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
LATINO OFFICERS ASSOCIATION CITY
OF NEW YORK, et al.,

                    Plaintiffs,


          -against-                                                99 Civ. 9568 (LAK)


THE CITY OF NEW YORK, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


          Appearances:


                    Richard A. Levy
                    Carl J. Levine
                    Cesar F. Rosado
                    LEVY RATNER, P.C.

                    Diane Paolicelli
                    LEVY, PHILLIPS & KONIGSBERG, LLP

                    Robert Spergel
                    LAW OFFICES OF ROBERT SPERGEL, ESQ.

                    *Attorneys for Plaintiffs*


                    James Lemonedes
                    Georgia Pestana
                    William S.J. Franenkel
                    Assistant Corporation Counsel
                    MICHAEL A. CARDOZO
                    CORPORATION COUNSEL OF THE CITY OF NEW YORK
                    *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

This dispute arises out of an employment discrimination class action.  By judgment and order dated September 15, 2004, I approved a settlement that, *inter alia*, incorporated the terms of the settlement agreement ("Agreement") and dismissed with prejudice the individual and class claims of all parties who did not opt out.  Pursuant to the Agreement, this Court retained jurisdiction for twenty-seven months.  Plaintiffs now move this Court to hold defendants in contempt for alleged failure to comply with the Agreement and to compel compliance with the judgment.

*Facts*

This action was commenced in September 1999.  On August 6, 2002, this Court certified a class consisting of all Latino and African-American individuals who had been, were, or would be employed by the NYPD as uniformed officers, including civilians who perform the same functions as uniformed officers, who had been or would be subjected to discrimination in the form of a hostile work environment, disparate disciplinary treatment, and retaliation for the exercise of their rights.  The Court designated the Latino Officers Association, Reuben Malave, Thaddeus Gamory, Charles Castro, Adam Alvarez, Louis Vega, Michael Padilla, Hector Ariza, Manuel Gomez, Christopher Castro, Wilfred Maldonado, Clifford Muniz, Manuel Nunez, Carlos Jimenez, Jose Mercedes, Daniel Figueroa, III, Hilda Susu, Anthony Miranda, Manuel Delgado, Parnell Peterson, Fernando Sanchez, and Miram Monserrate as class representatives.[1]  Subsequently, on December 18, 2003, the parties, with the assistance of Court-appointed Special Masters Kenneth Feinberg and

---

[1]

*Latino Officers Ass'n v. City of New York*, 209 F.R.D. 79, 81, 94 (S.D.N.Y. 2002).

Peter Woodin, signed a Stipulation and Order memorializing a negotiated settlement.  On September 15, 2004, I entered a judgment and order approving the Agreement and incorporating all of its terms.[2]  The Agreement provided, *inter alia*, that the New York City Police Department ("NYPD") would establish a "Disciplinary Review Unit" ("DRU") to track and analyze whether minority members of the NYPD were being treated in a discriminatory manner when disciplined,[3] establish an "Advisory Committee" to address employment discrimination and retaliation concerns,[4] develop a "Know Your Rights" guide to the NYPD discipline system,[5] and enhance existing databases and create new databases to capture, and report to plaintiffs on a specified schedule, data thought to be relevant to analyzing whether or not discrimination was continuing in the NYPD discipline system.[6]

---

[2]

See *Latino Officers Ass'n v. City of New York*, No. 99 Civ. 9568 (LAK)(KNF), 2004 WL 2066605 (S.D.N.Y. Sept. 15, 2004).  The judgment and order defined the class as "all Latino and African-American individuals who have been, are, or will be employed by the NYPD as members of the force, who have been or will be subjected to discrimination on the basis of race, color or national origin in the form of a hostile work environment, disparate disciplinary treatment, and retaliation for the exercise of their rights," and established a subclass, for the purpose of addressing individual claims for compensation or damages, as members of the force whose claims arose between September 9, 1996 through December 31, 2003, and who meet certain eligibility requirements delineated in the Agreement.  *Id.* at *1.  Four plaintiffs—Messrs. Gomez, Malave, Maldonado, and Peterson—opted out of the class to pursue individual claims.  *Latino Officers Ass'n v. City of New York*, 99 Civ. 9568 (LAK), 2006 WL 238989, *1 & n.3 (S.D.N.Y. Jan. 31, 2006).  The claims of Messrs. Malave, Maldonado, and Peterson have been settled.  Mr. Gomez's claim was tried to a defense verdict.  *Latino Officers Ass'n v. City of New York*, 99 Civ. 9568 (LAK), 2007 WL 1794933 (S.D.N.Y. June 20, 2007).

[3]

Pestana Decl. [Docket Item 277] Ex. A, at 4 ¶¶ 7-8.

[4]

*Id.* at 4-5 ¶¶ 9-11.

[5]

*Id.* at 7 ¶ 20.

[6]

*Id.* at 7-8 ¶¶ 21-26.

4

It provided also that this Court would retain jurisdiction for a period of twenty-seven months after October 18, 2004, the effective date ("Effective Date").[7]

Plaintiffs allege that defendants have failed to comply with the Agreement by failing to (1) establish the DRU or the Advisory Committee, (2) incorporate plaintiffs' suggestions into the Know Your Rights Guide (the "Guide"), and (3) provide the required statistical data in a timely and complete fashion. Plaintiffs allege also that discrimination has continued in the NYPD discipline system and that certain class representatives have been the subject of retaliation.

A.     *Disciplinary Review Unit*

Paragraphs 7 and 8 of the Agreement required that the NYPD "maintain within the Office of Equal Employment Opportunity ("OEEO") a Disciplinary Review Unit ("DRU") headed by an Assistant Commissioner and currently staffed by a Lieutenant, a Detective and an Associate Staff Analyst."[8]  The DRU's primary tasks are to "review and analyze the NYPD's disciplinary process regarding employment discrimination and retaliation," "track and analyze whether African American and Latino/Hispanic members . . . are being investigated, charged, or penalized in a discriminatory manner," and monitor compliance with the Agreement.[9]

---

[7]
   *Id.* at 3 ¶ 4.  Plaintiffs and defendants disagree as to the Effective Date of the Agreement, which is "thirty (30) days after final entry of judgment by this Court . . . ." *Latino Officers Ass'n v. City of New York*, No. 99 Civ. 9568 (LAK)(KNF), 2004 WL 2066605 (S.D.N.Y. Sept. 15, 2004).  As final judgment was entered on September 17, 2004, and as October 17 (30 days later) was a Sunday, the Effective Date is October 18, 2004.

[8]
   Pestana Decl. Ex. A, at 4 ¶ 7.

[9]
   *Id.* ¶¶ 7-8.

B.      *Advisory Committee*

Paragraphs 9 through 11 of the Agreement required that the NYPD maintain an Advisory Committee ("Committee") "to address employment discrimination and retaliation concerns."  Representatives from organizations officially recognized by the NYPD are invited to attend Committee meetings, which must be held at least quarterly.  Any Committee member may request that items be placed on meeting agendas and may meet with the Deputy Commissioner of the OEEO to raise any issues and concerns.[10]

C.      *The "Know Your Rights" Guide to the Discipline System*

Paragraph 20 of the Agreement required that the NYPD "develop a 'Know Your Rights' Guide to the NYPD Disciplinary Process as soon as practicable" and distribute that Guide to all members of the NYPD.   In developing the Guide, the NYPD agreed to "obtain recommendations from the Latino Officers Association and plaintiffs' counsel prior to finalization."[11]

Defendants submitted a draft of the Guide to plaintiffs on March 7, 2006, received comments and suggestions back on May 12, and notified plaintiffs on May 23, 2006 of the extent to which those recommendations were incorporated or rejected.[12]

---

[10]

*Id.* at 4-5 ¶¶ 9-10.

[11]

*Id.* at 7 ¶ 20.

[12]

Plaintiffs' Memorandum of Law [Docket Item 248] ("Pls. Mem.") at 17; Defendants' Memorandum of Law [Docket Item 275] ("Defs. Mem") at 13.

6

D.      *Capturing and Reporting Data on the NYPD Discipline System*

        The Agreement required the NYPD either to enhance or implement several databases that would enable it to collect data on the discipline system.  Paragraph 21 required the NYPD to maintain two fields in its OEEO database, one indicating "the OEEO's recommended finding with respect to each individual complaint" and the other "whether the Police Commissioner adopted, modified or rejected the OEEO recommendation."[13]

        Paragraph 22 required the NYPD to implement within 90 days of the Effective Date "a unified disciplinary database that will capture each stage, or development in a formal disciplinary case from initial consultation with the Department Advocate's Office through final disposition."[14] The database was to include, at a minimum, fields for (1) the race of the NYPD member, (2) "whether the initial consult resulted in a decision not to charge a member of the NYPD," (3) "whether a decision was made to send a matter back to the member's Command for a command discipline," (4) "whether the matter proceeded to a hearing," (5) "whether and what negotiated plea was offered and, if applicable, agreed upon," and (6) what, if any, penalty was imposed as a result of a plea or hearing.[15]

        Paragraph 23 required the creation and maintenance of a Command Discipline Tracking System to collect data on the NYPD's informal discipline system for the Patrol Services, Transit, Housing, and Internal Affairs Bureaus.  The database had to include fields to collect data

---

[13]

        Pestana Decl. Ex. A, at 7 ¶ 21.

[14]

        *Id.* ¶ 22.

[15]

        *Id.*

on (1) who received the Command Discipline ("CD"), (2) the type of CD issued, (3) the resultant disposition and penalty, and (4) the race of the NYPD member disciplined.  The NYPD agreed to have the database implemented for all commands within 90 days of the Effective Date.[16]

These provisions were supplemented with quarterly and cumulative reporting requirements.  Paragraph 24 required the NYPD to provide plaintiffs' counsel with quarterly statistical reports from the data collected on both formal and informal discipline, no later than sixty days after the close of each quarter during the Court's twenty-seven month period of retained jurisdiction.[17]

Plaintiffs allege, and defendants concede, that defendants did not implement the unified disciplinary database for formal discipline by the required date of January 18, 2005.  The parties agree also that (1) no quarterly formal discipline report was received for the final quarter of 2004,[18] (2) the first CD and OEEO (informal discipline) database reports, due by March 1, 2005, were received on October 14, 2005,[19] (3) subsequent CD and OEEO database reports were submitted to plaintiffs on December 8, 2005 (third quarter 2005 report), March 7, 2006 (cumulative report for calendar year 2005), July 7, 2006 (first quarter 2006 report), August 28, 2006 (second quarter 2006 report), November 28, 2006 (third quarter 2006 report), and March 1, 2007 (fourth quarter and

---

[16]

   *Id.* at 7-8 ¶ 23.

[17]

   *Id.* at 8 ¶ 24.  Exhibit A to the Agreement specifies in great detail the required contents of the reports and indicates that a cumulative report should accompany the quarterly reports.

[18]

   Levy Aff. [Docket Item 250] ¶ 19; Defs. Mem. at 4-5.

[19]

   Levy Aff. ¶ 20; Defs. Mem. at 5 (asserting that the production on October 14 included reports for the first two quarters of 2005).

cumulative 2006 reports),[20] (4) the first formal discipline reports were submitted to plaintiffs on April 12, 2006 (cumulative report for calendar year 2005),[21] and (5) subsequent formal discipline reports were submitted on July 19, 2006 (first quarter 2006 report), August 29, 2006 (second quarter and cumulative 2006 reports), November 29, 2006 (third quarter and cumulative 2006 reports), and March 1, 2007 (fourth quarter and cumulative 2006 reports).[22]

*Discussion*

A.    *The Contempt Standard*

The Court in this case incorporated all the terms of the Agreement into its judgment and order.  In consequence, noncompliance with any of the terms of the Agreement could constitute a violation of a court order.[23]  Accordingly, this Court has the authority to issue a contempt order in appropriate circumstances.  But contempt adjudications are not made lightly.

In order to prevail on a civil contempt motion, the moving party must establish that (1) the court order the contemnor failed to comply with was clear and unambiguous, (2) the proof

---

[20]    Defs. Mem. at 5.

[21]    Pls. Mem. at 6; Defs. Mem. at 5.

[22]    Tuthill Decl. [Docket Item 280] at 5-6.

[23]    *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381 (1994) ("The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal – either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order.  In that event, a breach of the agreement would be a violation of the order . . . ."); *Roberson v. Giuliani*, 346 F.3d 75, 82 (2d Cir. 2003) (citing *Kokkonen*).

of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.[24]   A court order is clear and unambiguous when it "leaves no uncertainty in the minds of those to whom it is addressed;"[25] those parties "must be able to ascertain from the four corners of the order precisely what acts are forbidden."[26]   The Court's power to hold a defendant in contempt is a "potent weapon"[27] that should not be exercised "where there is fair ground of doubt as to the wrongfulness of the defendant's conduct."[28]

B.      *The Disciplinary Review Unit*

Plaintiffs argue that defendants are in violation of the Agreement because defendants have not established a DRU as required.  Their arguments, however, are not persuasive.

First, plaintiffs argue that the mere naming of the unit as the "Employment Practices Unit" rather than the "Disciplinary Review Unit" violated paragraph 7 of the Agreement.[29]   The text

---

[24]

*See King v. Allied Vision Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995); *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989), *cert. denied* 495 U.S. 947 (1990).

[25]

*Hess v. New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114, 116 (2d Cir. 1988) (citing *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)).

[26]

*King*, 65 F.3d at 1058.

[27]

*Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

[28]

*California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885).

[29]

Pls. Mem. at 14.

of the paragraph calls for the creation of *a* Disciplinary Review Unit, not *a unit entitled* "Disciplinary Review Unit." The provision does not clearly and unambiguously require defendants to name the unit in any specific manner.

Plaintiffs next assert that the EPU has been "merged [ ] into a larger unit with other functions than disciplinary review" in alleged violation of the structure and function provisions of paragraphs 7 and 8 of the Agreement.[30] But paragraph 7 requires only the maintenance of a DRU "within the Office of Equal Employment Opportunity."[31] Plaintiffs offer no reason to suppose that it is not within the OEEO.

Finally, plaintiffs argue that defendants have violated the Agreement because the EPU is failing to perform its substantive duties.[32] They argue that (1) it is the EPU's responsibility to eradicate racial discrimination in the NYPD discipline system, that (2) plaintiffs' statistical analyses demonstrate continuing racial discrimination,[33] and in consequence that (3) the EPU is not functioning as required by the Agreement, thus placing defendants in violation of the Agreement.

This argument is unavailing because the logic is flawed. The EPU is not a guarantor

---

[30]

Levy Aff. ¶ 43.

[31]

Pestana Decl. Ex. A, at 4 ¶ 7.

[32]

Paragraph 7 of the Agreement provides that the "DRU shall, among other things, review and analyze the NYPD's disciplinary process regarding employment discrimination and retaliation" and "track and analyze" the disciplinary system. *Id.* Paragraph 8 provides that the "DRU will also be responsible for monitoring compliance with the terms of" the Agreement. *Id.* ¶ 8.

[33]

Faust Aff. [Docket Item 255] at 2-9.

against racial discrimination in the NYPD discipline system.  Instead, its responsibility is to track, analyze, and review the discipline system and monitor compliance.  Even a convincing demonstration of persistent discrimination therefore would not mean that defendants are violating the DRU provisions of the Agreement.

C.      *The Advisory Committee*

Plaintiffs argue that defendants have not complied with the Advisory Committee provisions of the Agreement because they repeatedly have refused to place on meeting agendas issues raised by Committee members.  Robert Gonzalez, the president of the Latino Officers Association and a member of the Committee, asserts that in July 2005 he requested two agenda items, one concerning the inclusion of an OEEO representative in the certification interviews of NYPD candidates for the FBI's academy and one seeking to implement a system to track the race of the officers who perform yearly evaluations of NYPD members.[34]  He asserts also that in August 2006 he requested that the Committee discuss the continuing discrimination allegedly evidenced by the disciplinary statistics provided to plaintiffs by defendants pursuant to the Agreement.[35]  None of these items ever was placed on any Committee meeting agenda.

Assuming that Mr. Gonzalez requested these items be placed on the agenda, it is not clear that defendants violated the Agreement by not doing so.  Paragraph 10 indicates that any Committee member *may request* that an issue be put on the agenda.  The Agreement does not clearly

---

[34]     *See* Gonzalez Aff. [Docket Item 251] ¶ 6-7.

[35]     *Id.* Ex. 1.

and unambiguously require that such requests be granted.[36]  Moreover, it permits any member to raise issues at meetings as "new business."

D.    The "Know Your Rights" Guide

Plaintiffs argue that defendants have failed to implement meaningfully a "Know Your Rights" Guide as required by paragraph 20 of the Agreement because they did not include in the final version of the Guide all the recommendations submitted by plaintiffs.  Defendants are not in contempt because they have satisfied the clear and unambiguous terms of paragraph 20, which require defendants to do three things: (1) develop the Guide "as soon as practicable,"[37] (2) "obtain recommendations from the Latino Officers Association and plaintiffs' counsel prior to finalization," and (3) distribute the Guide to all members of the NYPD.[38]  Defendants submitted a draft of the Guide to plaintiffs on March 7, 2006 and on May 12, 2006 received back a six-page letter detailing recommended changes.[39]  On May 23, 2006, defendants responded with a letter explaining how certain recommendations had been incorporated into the final draft and why others had been

---

[36]

Pestana Decl. Ex. A, at 5 ¶ 10.

[37]

Plaintiffs raise the fact that defendants did not submit an initial draft of the Guide to them until March 7, 2006, nearly 15 months after the Effective Date, but ultimately they do not argue that this amounts to noncompliance with the court order.  *See* Pls. Mem. at 17.  There is also no allegation that defendants have not distributed the finalized Guide to all NYPD members.

[38]

Pestana Decl. Ex. A, at 7 ¶ 20.

[39]

*See* Levy Aff. Ex. 15.

13

rejected.[40]

Plaintiffs essentially concede that defendants are in compliance with the terms of the Agreement.  Instead, they argue that defendants have failed to comply with the "intent and goals" of the Agreement.  This argument is, however, without merit.  Defendants must be able to ascertain what is required of them based solely on what is contained within the four corners of the Agreement.[41]  The fact that plaintiffs now may wish that they had bargained for stronger language does not license the Court to rewrite the Agreement they made.


E.      *Data Collection and Reporting*

As an initial matter, plaintiffs argue that defendants have failed to abide by the strict reporting deadlines specified in the Agreement.  They are correct.  It is uncontested that defendants did not implement the unified disciplinary database by January 18, 2005, that the first formal discipline reports were not submitted until April 12, 2006, and that by the third quarter of 2006, the formal discipline reports were being timely submitted.  It is also uncontested that the first CD and OEEO (informal discipline) database reports were not submitted until October 14, 2005 and that the reports were not timely submitted consistently until the second quarter of 2006.

Defendants' initial failure to implement the formal discipline database and provide the necessary formal and informal discipline reports by the required dates violated the strict terms of the Agreement.  This does not, however, place them in contempt because defendants were

---

[40]

*See* Pestana Decl. Ex. H.

[41]

*King v. Allied Vision Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995).

14

reasonably diligent and energetic in attempting to comply with the Court's order[42] and have since brought themselves into substantial compliance with it.[43]   Defendants experienced significant technical difficulties first in developing the unified disciplinary database and then in migrating data from an older database into it.   The ensuing delay occurred despite defendants dedicating significant resources to the problem and its solution.[44]   Once the technical difficulties were addressed, defendants were able to provide timely formal discipline reports for the second, third, and fourth quarters of 2006.

There were initial delays also in producing the informal discipline database reports, primarily because defendants wanted to produce both the formal and informal reports together. Defendants decided in October 2005 to proceed without the formal discipline reports and submitted all overdue informal discipline reports at that time.   Subsequently, defendants have complied substantially with the reporting deadlines.[45]   Thus, while the delays violated the strict reporting

---

[42]

*Id.*; *Powell v. Ward*, 643 F.2d 924, 933 (2d Cir. 1981).

[43]

*See Aspira of New York, Inc. v. Board of Educ. of the City of New York*, 423 F. Supp. 647, 651 (S.D.N.Y. 1976) (stating that in evaluating conduct in a contempt motion, "[t]he court is not empowered to command, any more than it can pretend for itself to achieve, performance approximating perfection.   The court is obliged, however, to require substantial performance and due diligence.").   The Second Circuit has not explicitly endorsed the substantial compliance standard, but it has indicated in dicta that "substantial compliance" is the appropriate standard in evaluating noncompliance in a contempt case. *See Juan F. by & through Lynch v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994) (citing *United States v. Commonwealth of Massachusetts*, 890 F.2d 507, 509 (1st Cir. 1989)).

[44]

Defendants assert that they had to train approximately 75 people to staff the project and that it took 10 data entry persons and 2 supervisors, working two shifts per each weekday, 4 months to migrate the necessary data.   Tuthill Decl. ¶ 5.

[45]

Aside from the initial delay, the only other time that defendants have been more than a few days late was in July 2006, when they missed the deadline for the first quarter of that year.

deadlines, defendants acted in good faith in an effort to comply and therefore their behavior is not contumacious.

Plaintiffs argue also that defendants' conduct did not comply with the reporting requirements because (1) they have not provided any formal or informal discipline reports for the last quarter of 2004 and (2) the formal discipline reports include only data from cases commenced on or after January 1, 2005.

With respect to the first issue, defendants argue that the Agreement is not clear as to whether or not they were required to provide statistical reports covering the fourth quarter of 2004. Their logic is that because the formal and informal databases did not need to be implemented until January 18, 2005, the first quarter for which the reports were required necessarily had to be the first quarter of 2005.

This is not a logical reading of the Agreement. Defendants' obligation to implement the databases by January 18, 2005 does not equate with an obligation to start reporting data only from that quarter onward. Paragraph 24 clearly states that "[d]uring the 27 month period [commencing on October 18, 2004], the NYPD will provide counsel for plaintiffs with quarterly statistical reports, due sixty (60) days following the close of any reporting period."[46] During that 27 month period, the first reporting period was the last quarter of 2004. Defendants' failure to provide any reports for that quarter violated the Agreement.

This does not mean, however, that defendants should be held in contempt. Defendants

---

Defendants attribute the delay to an oversight by its counsel, an oversight that was rectified quickly when discovered. *See* Pestana Decl. ¶ 13.

[46] Pestana Decl. Ex. A, at 8 ¶ 24.

16

have provided quarterly reports for the other eight quarters covered by the Agreement, informal discipline cumulative reports for 2005 and 2006, and formal discipline cumulative reports for 2005 and for the second, third, and fourth quarters of 2006.  Although defendants have not met the strict requirements of the reporting provisions, they have been reasonably diligent in providing to plaintiffs a substantial number of the necessary reports.

Plaintiffs seek also to hold defendants in contempt because defendants have included in the formal discipline statistics only cases commenced on or after January 1, 2005.  According to plaintiffs, this reduces substantially the number of cases provided in the 2005 cumulative report.[47] Again, this is not enough to establish contempt.  When defendants designed the new formal discipline database, they worked under the assumption that data that existed on an old database could be migrated to the new database.  This assumption proved inaccurate, as the data from the old database had to be input manually.  Given the time-consuming nature of this project and the need to start meeting the reporting deadlines, defendants oriented the database as a "going forward" project[48] and included only those cases commencing on or after January 1, 2005.  Defendants acted with reasonable diligence in (1) trying to provide the necessary data and (2) providing as much data as they could given the technical difficulties they faced.

F.      *Continuing Discrimination in the Disciplinary System*

Plaintiffs argue that both statistical and anecdotal evidence demonstrate continuing

---

[47]        Pls. Mem. at 7.

[48]        *See* Tuthill Decl. ¶ 5.

and rampant discrimination in the NYPD informal and formal discipline systems.  This is, in effect, an allegation that defendants have not complied either with the general introductory provisions or with paragraph 3 of the Agreement.

Plaintiffs' argument fails for one basic reason: defendants did not warrant that racial discrimination never again would occur in the NYPD discipline system.  While the Agreement recites that the NYPD "will not allow discrimination based on actual or perceived race, color, national origin, ethnicity or any other reason prohibited by federal, state or local law,"[49] it did not create a regime of strict liability.  If plaintiffs believe that discrimination continues, notwithstanding the Agreement, they may seek redress through appropriate means, such as the federal and state laws that served as the basis for the underlying class action.  The remedy, in the absence of proof that the NYPD is "allow[ing] discrimination," is not contempt.  Plaintiffs' showing falls far short of establishing that the NYPD is "allow[ing] discrimination," even assuming that discriminatory behavior occurs from time to time, as it regrettably does in many parts of our society.

---

[49] Pestana Decl. Ex. A, at 3 ¶ 3.

*Conclusion*

For the foregoing reasons, plaintiffs' motion for contempt and to compel compliance with the settlement and order [docket item 247] is denied.  Because there are no grounds on which to hold defendants in contempt, the Court denies all of plaintiffs' requests for relief.

SO ORDERED.

Dated:          October 26, 2007

_____

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)